IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| KEVIN B. EYSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:18-cv-01141 |
| | ) | |
| METROPOLITAN NASHVILLE | ) | JUDGE CAMPBELL |
| AIRPORT AUTHORITY, | ) | MAGISTRATE JUDGE HOLMES |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

### I. Introduction

Pending before the Court are Defendant's Motion for Summary Judgment (Doc. No. 20), Plaintiff's Response (Doc. No. 27), and Defendant's Reply (Doc. No. 29). For the reasons set forth below, Defendant's Motion for Summary Judgment (Doc. No. 20) is **GRANTED,** and this action is **DISMISSED.**

### II. Factual and Procedural Background

Plaintiff Kevin B. Eyster brings this action alleging Defendant Metropolitan Nashville Airport Authority ("MNAA") violated the Americans With Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), and the Tennessee Disability Act, Tenn. Code Ann. § 8-5-103 ("TDA"), by failing to provide a reasonable accommodation for his disability, by terminating him because of his disability, and by retaliating against him for asserting his rights under the ADA and the TDA. (Doc. No. 1).

Plaintiff began working at MNAA as a Commercial Development Specialist on August 21, 2017. (Defendant's Statement of Material Facts Not in Dispute and Plaintiff's Statement of Additional Material Facts, ¶ 1 (hereinafter "Summary Judgment Facts") (Doc. No. 30)). Rebecca

Ramsey, Director of Concession Affairs, was Plaintiff's direct supervisor at MNAA. (*Id.* ¶ 2). As Director of Concession Affairs, Ms. Ramsey had broad responsibility for overseeing the retail concessions program at MNAA, which accounts for $200,000,000 in annual revenue. (Summary Judgment Facts ¶ 16).

On his first day of work, Plaintiff completed an MNAA form entitled "Post-Offer Self-Identification Affirmative Action Program for Employment of Individuals, Including Veterans with Disabilities and Protected Veterans." (*Id.* ¶ 3; Doc. No. 28-10). On the form, Plaintiff checked a box next to the statement: "I have a disability, and I have described below the reasonable accommodations, which I believe would enable me to perform my job properly and safely, including any special equipment, changes in the physical layout of the job, or other reasonable accommodations." (*Id.*) In the line below, Plaintiff wrote: "None at this time." (*Id.*)

Plaintiff has not submitted any medical evidence describing the nature of his disability, or the way it substantially limits a major life activity. 42 U.S.C. § 12102(1) (defining "disability"). During his deposition, Plaintiff testified that he had a brain hemorrhage and a stroke in 2007 that left him with a mild cognitive impairment and a visual impairment called "left homonymous hemianopsia." (Doc. No. 28-1, at 26-30; Summary Judgment Facts ¶ 5). The visual impairment, according to Plaintiff, results in his brain's inability to process things from the left, making visual tasks more difficult, like computer work, reading, and processing information. (Doc. No. 28-1, at 30-32).[1]

---

[1] Plaintiff's testimony about his visual impairment is not altogether clear. Plaintiff testified that, although he has a visual impairment, he has 20/20 vision, and "[t]here's nothing wrong with my eyes." (*Id.,* at 35, 231-32, 237-38). On the other hand, when explaining why he could not complete the tasks assigned to him at MNAA, Plaintiff testified: "Because I'm legally blind." (Doc. No. 28-1, at 79). When asked if there were specific types of problems his impairment made it difficult to solve, Plaintiff testified: "I can't think of anything that I wouldn't be able to solve or would have difficulty solving." (Doc. No. 28-1, at 75-76). At

As a Commercial Development Specialist in Concession Affairs, Plaintiff worked in the property management side of the airport's business, which includes management of leases with airport tenants, and managing revenue shared by those tenants with the airport. (Summary Judgment Facts ¶ 10). In the written Job Description for the position, the "Job Summary" provides as follows:

> The Commercial Development Specialist is responsible for coordinating activities and programs along with other property management and development activities for MNAA. Other responsibilities include preparing leases, amendments, permits, and other legal documents and conducting inspections to ensure compliance with lease terms, conditions, and MNAA practices.

(*Id.* ¶ 11; Doc. No. 28-11, at 1). The Job Description goes on to list the "Essential Job Responsibilities" and "Supplemental Job Responsibilities" as follows:

### ESSENTIAL JOB RESPONSIBILITIES

• Coordinates with internal departments and business partners to provide resolutions to day-to-day tenant issues.

• Conducts airport leaseholds and facilities inspections to ensure compliance with lease terms and conditions and established MNAA practices.

• Identifies and monitors terminal compliance issues as they relate to public and passenger safety.

• Monitors and follows up for compliance on all agreements, leases, permit terms, and conditions.

• Interprets airport agreements and documents.

• Prepares correspondence, documentation, exhibits, and tenant reports.

---

the same time, Plaintiff pointed out that he has been given extra time to complete tasks as an accommodation throughout college, and "throughout anything I have ever done. . ." (*Id.,* at 81).

3

• Maintains accurate records of all lease and concession agreements, including effective dates, termination dates, and type of concession operation.

• Processes Airport Improvement Requests (AIRs) and ensures submission is consistent with the lease agreement.

• Maintains regular and on-time attendance.

• Follows all safety regulations.

• Supports MNAA's commitment to its culture and values, including integrity, service, teamwork, and innovation.

**SUPPLEMENTAL JOB RESPONSIBILITIES**

• Prepares leases, amendments, permits, and other legal documents.

• Resolves day-to-day tenant issues independently and routinely.

• Coordinates business partner activities and programs along with other property management and development activities for MNAA.

• Gathers and processes data to create summaries and conclusions for concessions and/or property-related issues.

• Initiates and cultivates communication with airport tenants to ensure favorable working relationships among departmental administration, tenants, and community.

• Responds to general requests regarding airport concessions, business partners, and/or properties.

• Shows available property or space to prospective tenants.

• Prepares a variety of concession agreements and related leases.

• Conducts industry surveys.

• Performs other duties as assigned.

(*Id.* ¶ 12; Doc. No. 28-11, at 1). The Job Description goes on to list "Knowledge, Skills, Abilities, and Other Characteristics" as follows:

• Office Management: Knowledge of general office management practices and procedures.

4

• Microsoft Office: Skill in using Microsoft Office applications such as Outlook, Word, Excel, and PowerPoint.

• Microsoft Windows: Skill in using the Microsoft Windows operating system.

• Computer Use: Skill in using a personal computer, the internet, and other software to perform job-related functions.

• Efficiency: Skill in working efficiently under strict deadlines.

• Managing Workload: Skill in organizing and prioritizing work, handling multiple responsibilities, and meeting deadlines.

• Problem Solving: Skill in identifying problems and reviewing related information to develop and evaluate options and implement solutions.

• Reporting: Skill in preparing and producing timely and accurate oral and written reports.

• Communication: Skill in communicating effectively at all levels of the organization and with stakeholders, both orally and in writing.

• Teamwork: Skill in working with others as a team while taking responsibility for outcomes.

• Office Equipment: Skill in using standard office equipment such as telephones, copy machines, scanners, multi-functional printers, and fax machines.

• Written Comprehension: Ability to read and understand information and ideas presented in writing.

• Written Expression: Ability to use words and sentences in writing so others will understand.

• Dependability: Acts reliably and responsibly with others.

• Professionalism: Demonstrates professional behavior and appearance in all situations.

(*Id.* ¶ 13; Doc. No. 28-11, at 2).

Plaintiff testified that the vast majority of his time at MNAA was spent creating Excel spreadsheet reports for Ms. Ramsey regarding tenants' concession activity. (Doc. No. 28-1, at 76-

5

77). According to Ms. Ramsey, Plaintiff appeared, from early on, to be having trouble completing the tasks assigned. (Declaration of Rebecca Ramsey ¶ 10 (Doc. No. 22-3)). On October 5, 2017, Ms. Ramsey met with Plaintiff "to discuss how he was acclimating to the department and performance problems I had observed." (*Id.* ¶ 11). Ms. Ramsey described performance deficiencies she had noted; in particular, Plaintiff "was not processing concession activity reports as quickly or accurately as I needed them, specifically, 'producing Excel spreadsheets and compiling data on demand in an oftentimes quick-turnaround fashion as is required.'" (*Id.* ¶ 12 (quoting "Note to File" regarding meeting (Doc. No. 22-3, at 8-9)).

According to Plaintiff, during the meeting, he told Ms. Ramsey the "specific nature" of his disability, and asked her for more time to complete his assignments. (Doc. No. 28-1, at 108-09; 119-21). Plaintiff said Mr. Ramsey told him she could not give him more time because she and the department were under "time pressures." (*Id.*) Instead, Plaintiff said Ms. Ramsey offered him the opportunity to take an Excel online tutorial. (*Id.,* at 109-10). Plaintiff testified that he also told Ms. Ramsey he was bothered by distractions associated with the location of his work area, and she told him she would speak with Stephanie Ladd, the Human Resources Manager, about what could be done. (*Id.,* at 110-12). MNAA later offered Plaintiff earplugs and noise-cancelling headphones to assist with the work area distractions. (*Id.,* at 113-14). Plaintiff testified those devices did not solve the problem. (*Id.*, at 114-15). MNAA also offered to adjust Plaintiff's work schedule so that he could come in early or stay later at night. (*Id.,* at 125). Plaintiff said he did not see this suggestion as reasonable. (*Id.*)[2]

---

[2] Interestingly, Plaintiff's neuropsychologist did not attribute his difficulties at MNAA to his vision impairment. Plaintiff testified he consulted the neuropsychologist to help determine why he could not meet his supervisor's expectations, and was told there was "nothing in my brain that is preventing me from creating the spreadsheets." (Doc. No. 28-1, at 103-04). The neuropsychologist "felt that it was a moving

6

Case 3:18-cv-01141 Document 40 Filed 08/14/20 Page 6 of 20 PageID #: 498

According to Ms. Ramsey, she had another conversation with Plaintiff on October 27, 2017, and informed him he was still not meeting expectations with regard to accuracy or timeliness of reports. (Doc. No. 22-3 ¶ 16). Ms. Ramsey gave Plaintiff his Three-Month Review on November 17, 2017, which included a number of positive comments, but also included the following under "Job Knowledge:"

> Although Kevin understands the basics of aviation and airport management, he and I have discussed on several occasions the necessity of 'proficiency' in using available tools to perform his job requirements; specifically, 'Microsoft Excel to process and analyze data to create summaries and conclusions for a variety of commercial development related issues' and their remains significant deficits in this mental and manual skill as described in the Job Standards for a Commercial Development Specialist. I have made available MNAA resources for on-line learning from Microsoft that is self-paced and covers a variety of MS Office products including Excel for Kevin to improve these skills. In our 10/5 meeting on the matter I referred to the Job Standards for his position and expressed my concern over his ability to accomplish what was required; at that time he indicated he had not had the opportunity to begin any of the online training modules. I impressed upon him the need to do so and said he could take time in the office to go through some exercises. Additionally I indicated I would continue to give him tasks that required him to exercise this skill so he could improve. I have since given him 3-4 tasks that required substantial data entry with the specific direction to create a meaningful report with the information and guidance provided. There has not been a successful completion of these tasks to date.

(*Id.* ¶ 17). After meeting with Plaintiff about his performance on several occasions throughout November and December 2017, Ms. Ramsey decided to recommend Plaintiff's termination at the

---

target and a communication issue between my supervisor and me." (*Id.,* at 104; 137, 185). The neuropsychologist declined to recommend an accommodation plan on behalf of Plaintiff. (*Id.,* at 189-90). He did, however, suggest Plaintiff try noise cancelling headphones and an adjusted work schedule to be in the office when there were fewer coworkers present. (Summary Judgment Facts ¶ 40).

7

end of his six-month probationary period in February 2018 because she believed he was unable to perform the essential functions of the job. (*Id.* ¶¶ 18-23; Summary Judgment Facts ¶¶ 49-50).[3]

### III. Analysis

#### A. The Standards Governing Motions for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.* Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986); *Shreve v. Franklin County, Ohio,* 743 F.3d 126, 132 (6th Cir. 2014). The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132. Ultimately, the court is to determine "whether the evidence

---

[3] Ms. Ramsey was subsequently terminated for performance-related issues unrelated to how she handled Plaintiff's request for accommodation. (Summary Judgment Facts ¶ 51).

8

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## B. ADA Failure to Accommodate

The ADA prohibits discrimination against "a qualified individual on the basis of disability" with regard to hiring, compensation, discharge, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An employer's failure to provide a reasonable accommodation to a disabled employee constitutes discrimination. 42 U.S.C. § 12112(b)(5)(A) ("discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."); *see also Fisher v. Nissan North America, Inc.*, 951 F.3d 409, 415 (6th Cir. 2020).

Failure-to-accommodate claims are evaluated under "the direct evidence test," which does not require the court to draw any inferences to conclude the employee has proven the employer failed to accommodate. *Fisher*, 951 F.3d at 416-17; *Tchankpa v. Ascena Retail Group, Inc.,* 951 F.3d 805, 811 (6th Cir. 2020). The Sixth Circuit uses a multi-part test to evaluate these claims: the employee "bears the burden of establishing (1) that he is disabled, and (2) that he is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Fisher,* 951 F.3d at 417 (quoting *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 868 (6th Cir. 2007)); *Tchankpa,* 951 F.3d at 811-12. The employer bears the burden

9

of "'proving that a challenged job criterion is essential, and therefore, a business necessity, or that a proposed accommodation will impose an undue hardship'" upon the employer. *Id.*

The employee must show the requested accommodation is "reasonable." *Fisher,* 951 F.3d at 419; *Tchankpa,* 951 F.3d at 812. Requested accommodations are reasonable "only if they 'address a key obstacle preventing [the employee] from performing a necessary function of [his job.]'" *Tchankpa,* 951 F.3d at 812 (quoting *Jakubowski v. Christ Hosp., Inc.,* 627 F.3d 195, 202 (6th Cir. 2010)). A proposed accommodation requesting an employer remove an "'essential function'" from the position is "'*per se* unreasonable.'" *Bush v. Compass Group USA, Inc.,* 683 Fed. Appx. 440, 449 (6th Cir. 2017) (quoting *E.E.O.C. v. Ford Motor Co.,* 782 F.3d 753, 761 (6th Cir. 2015)). The reasonableness of a proposed accommodation is a question of fact. *Fisher,* 951 F.3d at 419.

Upon receiving a request for accommodation, the employer must consider "'(1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee.'" *Tchankpa,* 951 F.3d at 812. (quoting *Keever v. City of Middletown,* 145 F.3d 809, 812 (6th Cir. 1998)). The employer and employee must engage in an "'informal, interactive process' to negotiate an accommodation that allows the disabled employee to work despite his limitations." *Id.* An employer may require medical documentation confirming the employee's disability and supporting a proposed accommodation. *Id.*, at 812-13.

Plaintiff claims MNAA failed to accommodate his visual impairment. The accommodations Plaintiff allegedly requested from MNAA were: (1) additional time to complete the concession spreadsheet reports; (2) earlier assignment of the reports; or (3) the assignment of

10

fewer reports. In essence, Plaintiff sought more time to complete the reports,[4] or reassignment of the reports to another employee. Defendant argues Plaintiff's requested accommodation was not "reasonable" because it would have eliminated an "essential" function of Plaintiff's job. Producing timely and accurate concession reports, according to Defendant, is an essential function of the Commercial Development Specialist position. Plaintiff argues that producing the reports is not an essential job function.

Federal regulations implementing the ADA list the following non-exhaustive factors to consider in determining whether a particular function is "essential:" (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the work experience of past incumbents in the job; and (6) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3).[5]

In her Declaration, Ms. Ramsey, Plaintiff's former supervisor, states that collection of tenants' concession data and presentation of that data in spreadsheet reports is one of the "critical responsibilities" of a Commercial Development Specialist. (Doc. No. 22-3 ¶ 7). Ms. Ramsey states that, as Director of Concession Affairs, it was critical that she have real-time information about concession activity to make decisions, and that the information was also required by her superiors.

---

[4] When asked, Plaintiff declined to specify any particular amount of extra time that would be sufficient. (Doc. No. 28-2, at 175-179).

[5] The regulations also list "the terms of a collective bargaining agreement," but there is no such agreement to consider here.

11

(*Id.* ¶ 5). Thus, according to Ms. Ramsey, it was not feasible to provide Plaintiff with additional time to complete the reports:

> It was not feasible . . . to relieve Mr. Eyster from report preparing responsibilities, as compiling information and creating actionable reports is a central function of the Commercial Development Specialist job. Likewise, permitting Mr. Eyster an unidentified amount of additional time was impossible because the Department needs this information as soon as possible.

(*Id.* ¶¶ 14, 24).

Defendant has also filed the Declaration of Josh Powell, currently the Director of Airline Affairs and Air Service Development at MNAA, who served in the same position as Plaintiff (with a different name) for more than three years, beginning in 2009. (Doc. No. 22-4 ¶¶ 2-3). In that position, Mr. Powell was required to "monitor, manage, and report various activities, including airline, concession, rental car, and other revenue-generating activities." (*Id.* ¶ 4). One of the "critical responsibilities" in that position, according to Mr. Powell, is "collecting information about the various revenue-producing activities and summarizing the data in Excel spreadsheets to provide actionable information for my supervisors." (*Id.*) The reports are used "to verify tenant/contractor compliance with lease terms to ensure the airport concessionaires provide appropriate and efficient levels of service to customers (based on location and/or category), establish benchmarks for comparison with other airports and markets, and recognize real-time or near real-time trends in sales." (*Id.* ¶ 7). Mr. Powell states that "it would not be feasible for MNAA to remove responsibility for preparing Excel reports from a Commercial Development Specialist's job duties." (*Id.* ¶ 8). Creating the reports is one of the "key responsibilities of the position" and without those duties, the position "would not amount to a full-time job." (*Id.*)

Defendant points out that the responsibilities described by Ms. Ramsey and Mr. Powell are consistent with the written Job Description for the Commercial Development Specialist position.

12

As discussed above, "Essential Job Responsibilities" include "Prepar[ing] correspondence, documentation, exhibits, and tenant reports." (Doc. No. 28-3, at 1). "Supplemental Job Responsibilities" include "Gather[ing] and process[ing] data to create summaries and conclusions for concessions and/or property-related issues." (*Id.*) The "Knowledge, Skills, Abilities, and Other Characteristics" for the position include "Reporting: Skill in preparing and producing timely and accurate oral and written reports;" and "Efficiency: Skill in working efficiently under strict deadlines." (*Id.*, at 2).

Applying the factors listed in the regulation to the evidence presented by Defendant indicates that producing time-sensitive spreadsheet reports was an essential job function for a Commercial Development Specialist. The Declarations of Ms. Ramsey and Mr. Powell reflect the "employer's judgment" that this function is essential. The written job description also supports that conclusion. As for the remaining factors, Mr. Powell, who previously had the same job, states that assigning production of the reports to someone else would result in the position being less than "full time." *See, e.g., Bush v. Compass Group USA, Inc.,* 683 Fed. Appx at 450 n.3 ("The ADA 'does not require employers to create new jobs . . . in order to accommodate a disabled individual.")

Plaintiff argues the Court should disregard Mr. Powell's Declaration because he is not "similarly situated" to Plaintiff as Mr. Powell served in the position in 2009-2012, under the title "Properties Specialist" rather than "Commercial Development Specialist." Plaintiff has not presented any evidence, however, to contradict Mr. Powell's testimony that he worked in the same job with a different title. In any event, Mr. Powell is not required to be "similarly situated" in order

13

to testify about the requirements of the position. Mr. Powell has worked at MNAA since 2008, and has satisfactorily explained his familiarity with the requirements of the position.[6]

Plaintiff argues production of the reports is not "essential" by pointing to his observations of another MNAA employee, Jason Thompson. (Doc. No. 28-1, at 89-90). According to Plaintiff, Mr. Thompson worked as a "specialist" and spent time on other duties instead of working on Excel reports. (*Id.*) Plaintiff has not provided a declaration or deposition testimony from Mr. Thompson, nor has he provided enough information for the Court to determine if his "observations" accurately reflect Mr. Thompson's actual job duties. *See Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment.") Plaintiff admits he does not know whether his job duties were the same as his predecessor or successor in the same job. (Doc. No. 28-1, at 143).

Plaintiff also argues that the only responsibilities listed in the written Job Description that are essential are those listed as such, and the responsibilities and skills listed elsewhere in the Job Description are not essential. But a duty may be "essential" even if it is not listed as such in a written job description. *See Wagner v. Sherwin-Williams Co.,* 647 Fed. Appx. 645, 649 (6th Cir. 2016) (explaining that the inclusion, in a written job description, of a requirement that the store manager be able to drive supports the conclusion that driving is an essential job function even if the requirement is not listed under "Essential Duties"). Even if the Court were to accept Plaintiff's

---

[6] Plaintiff claims this information is contradicted by the deposition testimony of MNAA's designated Rule 30(b)(6) representative, Karisse Spray. (Doc. No. 28-8, at 13). Ms. Spray was asked if MNAA tried to determine if Plaintiff had been assigned more Excel spreadsheet work than his predecessor or his coworkers in Commercial Development. Ms. Spray testified that she had not spoken with Plaintiff's predecessor, but a peer employee stated that a significant portion of his job was spent on preparing Excel spreadsheets. (*Id.,* at 36-48). The Court is not persuaded this testimony is inconsistent with that of Mr. Powell.

14

premise, however, preparing "tenant reports" *is* listed as an "essential" job responsibility, as described above.

Indeed, the Court notes Plaintiff's own testimony regarding Ms. Ramsey's need to quickly access the data provided in the reports: "Well, I mean she needs to be able to utilize data quickly for whatever project she was working on. It was used for her as a tool to help do her job." (Doc. No. 28-1, at 77-78). And when asked if there was a time-sensitive nature to Ms. Ramsey's job, Plaintiff testified: "Oh, of course. . . she has somebody else asking her for the information, whether it's her boss, a consultant, or just whatever it is that she's working on in that given day." (*Id.*, at 101-02).

Based on the record before the Court, Plaintiff has failed to present evidence sufficient to create a genuine factual dispute that producing time-sensitive reports was not "essential" to the job he held. Consequently, Plaintiff has failed to present evidence sufficient to withstand summary judgment that his requests for accommodation – more time to complete the reports or assignment of the task to someone else – were "reasonable." *See Bush,* 683 Fed. Appx. at 449 (A proposed accommodation requesting an employer remove an "essential function" from a position is "*per se* unreasonable.") Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA failure-to-accommodate claim.[7]

---

[7] Plaintiff suggests in his brief that MNAA failed to engage in an interactive process with him to accommodate his disability, but does not cite to any factual basis for the allegation other than MNAA's decision to decline the accommodations requested by Plaintiff in the form of more time and reassignment of reports. Plaintiff does not dispute MNAA offered him accommodations (headphones, flexible work schedule); he simply believes those accommodations were insufficient. In any event, failure to engage in the interactive process is an independent violation of the ADA only if the plaintiff shows he proposed a *reasonable* accommodation. *Rorrer v. City of Stow,* 743 F.3d 1025, 1041 (6th Cir. 2014); *Gati v. W. Kentucky Univ.*, 762 Fed. Appx. 246, 252 (6th Cir. 2019). For the reasons described above, Plaintiff has not shown he proposed a "reasonable" accommodation, and therefore, he cannot establish an independent claim for failure to engage in the interactive process.

15

### C. Disability Discrimination

In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation; and (3) he suffered an adverse employment action because of his disability. *Demyanovich v. Cadon Plating & Coatings, L.L.C.,* 747 F.3d 419, 433 (6th Cir. 2014); *Perry v. American Red Cross Blood Services*, 651 Fed. Appx. 317 (6th Cir. 2016).

Plaintiff claims MNAA engaged in discrimination by terminating him because of his disability. Defendant argues Plaintiff has failed to present evidence that he is otherwise qualified to perform an essential function – production of time-sensitive reports – of the Commercial Development Specialist position. Plaintiff argues that production of those reports is not essential.

As the Court discussed above, Plaintiff has failed to present evidence from which a reasonable jury could find that producing time-sensitive reports was an "inessential" part of the Commercial Development Specialist job. The record reveals, and Plaintiff repeatedly testified, that he was unable to perform that task as required, nor has he proposed a "reasonable" accommodation that would enable him to perform that task. Thus, Plaintiff has failed to present evidence sufficient to withstand summary judgment regarding the second requirement of a *prima facie* case of disability discrimination. Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA discrimination claim.

### D. Retaliation

Plaintiff's final ADA claim is that MNAA retaliated against him after he revealed his disability. The ADA prohibits an employer from discriminating against an employee in retaliation for exercising rights under the statute. *Allman v. Walmart, Inc.*, ___ F.3d ___, 2020 WL 4359732, at *3 (6th Cir. July 30, 2020). The plaintiff bears the burden of establishing a *prima facie* case of

16

retaliation under the ADA. *Allman*, 2020 WL 4359732, at *3. To do so, he must show: (1) he engaged in a protected activity under the ADA; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity. *Id.* If the plaintiff makes that showing, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* If the defendant makes that showing, the burden shifts back to the plaintiff to show the reason given was actually a pretext designed to mask unlawful discrimination. *Id.* A plaintiff may prove pretext by establishing the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *Id.*

Plaintiff appears to identify two "adverse employment actions" with regard to this claim. An "adverse employment action," for purposes of a retaliation claim, is conduct that might have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569-70 (6th Cir. 2019) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). In addition to his termination, Plaintiff argues Ms. Ramsey retaliated against him after he revealed his visual impairment by "doubling, tripling, quadrupling the amount of Excel tasks" he was given during October and November 2017. (Doc. No. 28-1, 131).

Although Defendant does not dispute Plaintiff's termination was an "adverse employment action," Defendant argues Plaintiff cannot, as a factual matter, establish the second alleged "adverse employment action," and disputes Plaintiff's allegation that his workload increased. Indeed, the only evidence Plaintiff cites to support the allegation is his own testimony that Ms. Ramsey retaliated by "doubling, tripling, quadrupling" his Excel assignments after learning of his visual impairment. This testimony is lacking in precision (*i.e.,* did the workload double or did it

17

triple or did it quadruple?), and is unsupported by any documentation, such as a workload tracking sheet.[8] Such imprecise, conclusory testimony does not create a genuine factual dispute. *See Viet,* 951 F.3d at 823-26 (explaining, in a Fair Labor Standards Act case, that an employee's conclusory testimony about his work schedule is not sufficient to withstand summary judgment on the issue of whether he is entitled to overtime pay).

Even if the Court assumes Plaintiff's workload actually increased after he advised Ms. Ramsey about his visual impairment, however, Plaintiff has not presented sufficient evidence of the third element – causation. In order to establish causation, a plaintiff must demonstrate that, "but for" the protected activity, the employer would not have taken the adverse employment action. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015). Plaintiff claims his workload increased in October and November after the meeting with Ms. Ramsey on October 5, during which he advised her of his visual impairment. Evidence of such temporal proximity between the protected activity and the adverse employment action can constitute evidence of a causal connection. *George v. Youngstown State Univ.* ___ F.3d ___, 2020 WL 4035164, at *8 (6th Cir. Jul. 17, 2020). But temporal proximity alone generally is not sufficient to establish causation, and generally must be coupled with other indicia of retaliatory conduct. *See Kenney v. Aspen Techs., Inc.,* 965 F.3d 443, 448 (6th Cir. 2020); *Sensabaugh v. Halliburton*, 937 F.3d 621, 630 (6th Cir. 2019). Plaintiff has offered no evidence suggesting Ms. Ramsey assigned Plaintiff more spreadsheets simply because Plaintiff advised her of his visual impairment. Evidence of temporal proximity is even weaker with regard to the other alleged adverse employment action –

---

[8] Plaintiff's *opinion* on the nature of his workload in October and November is not entitled to a great deal of weight as he concedes he does not know whether the nature of his work was the same or different than his predecessor or successor. (Doc. No. 28-1, at 143).

18

termination. Plaintiff advised Ms. Ramsey of his disability on October 5, 2017, and Plaintiff was not terminated until February 2018. The Court is not persuaded that Plaintiff's evidence on causation for either adverse employment action is sufficient to withstand summary judgment.

Even if the Court assumes Plaintiff has presented evidence sufficient to establish a *prima facie* case, Defendant has proffered a legitimate nondiscriminatory reason for each of the alleged adverse employment actions. Defendant asserts that, if Plaintiff's workload increased, it did so naturally, as Plaintiff's tenure in his position continued. In other words, employees are expected to be more productive as they gain experience in their jobs. As for Plaintiff's termination, as discussed above, Defendant's position is that Plaintiff was terminated because he was unable to perform the work required of an employee in his position. Both of these articulated reasons are legitimate and nondiscriminatory. Thus, Plaintiff must show the reasons are pretextual.

Plaintiff has offered no evidence indicating the real reason Ms. Ramsey assigned more work to him and ultimately recommended his termination was because he had a disability. Plaintiff offers only his personal opinion on that score and that is insufficient. *See E.E.O.C. v. Ford Motion Co.,* 782 F.3d at 768 (explaining that the court is not to consider employee's "subjective beliefs," but is to look at the facts as they appear to the person making the decision to terminate the employee). Moreover, it is undisputed Ms. Ramsey raised performance concerns with Plaintiff even *before* Plaintiff advised her of his visual impairment. (Doc. No. 28-1, at 124 ("Q. . . [Ms. Ramsey] raised performance concerns before you raised your visual issue, right? A. Yes.")). Indeed, Plaintiff testified the feedback he received during the first month or so of working at MNAA – before the October meeting – was to "Do this faster." (*Id.*, at 107). He does not suggest these performance concerns were unfounded or otherwise satisfactorily resolved over the course of his tenure. Therefore, Plaintiff has not presented sufficient evidence to withstand summary

19

judgment on the issue of pretext. Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

E. **State law claim**

TDA claims are analyzed under the same principles as those utilized for analysis of ADA claims. *Cardenas-Meade v. Pfizer, Inc.*, 510 Fed. Appx. 367, 370 (6th Cir. 2013). Therefore, for the reasons described above, Defendant is entitled to summary judgment on Plaintiff's discrimination and retaliation claims under the TDA. As Plaintiff concedes (Doc. No. 27, at 1 n.1), the TDA does not include a "reasonable accommodation" component. *See Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 842 (Tenn. Ct. App. 2009) Thus, Defendant is entitled to summary judgment on Plaintiff's "reasonable accommodation" claim as well.

## IV. Conclusion

For the reasons discussed above, the Court grants summary judgment to the defendant on all claims, and this action is dismissed.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE